Samuel DERECKTOR

v.

The UNITED STATES.

No. 50018.

United States Court of Claims.
July 13, 1954.

Writ of Certiorari Granted
Jan. 31, 1955.

See 75 S.Ct. 336.

Seymour W. Miller, Brooklyn, N. Y., for plaintiff. I. G. Seeger, New York City, and I. A. Logue, Brooklyn, N. Y., were on the briefs.

Thomas F. McGovern, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant. Leavenworth Colby, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff sues for damages because the United States Maritime Commission sold him a ship and then, due to the intervention of the Department of State, refused to give him the documents needed by him in order to operate or resell it. The ship in question was the Colonel Frederick C. Johnson. It had, before World War II, operated as a passenger boat on the Hudson River, its name being the Dewitt Clinton. During the war the Army had requisitioned the ship and had virtually rebuilt it for use as a troop transport. At the end of the war it was a much better ship than would have been expected considering its age.

On February 27, 1947, the Maritime Commission invited sealed bids for the ship, which was then laid up. The invitation contained the following provision:

"* * * The Commission will consent to the transfer of the vessel to foreign ownership, registry, and flag, pursuant to the applicable provisions of the Shipping Act, 1916, as amended, provided the transfer is made effective within (6) months from the date of award and provided, further, the transferee, in the determination of the Commission, is not an alien country, or a national or nationals thereof prohibited by the Government of the United States from engaging in commercial transactions with the United States and its citizens or anyone acting on behalf or in the interest thereof. The applicant shall submit such evidence as the Commission shall deem necessary in connection with such application for transfer."

The plaintiff bid on the ship and his bid was accepted by the Maritime Commission on May 16, 1947. On June 12 he paid the purchase price $48,120 and in his letter forwarding the payment he said:

"Kindly let me have a Bill of Sale and Certificate of Registry, and a written acknowledgment of my full right to transfer this vessel to foreign registry if I should so desire."

Within a week the Maritime Commission wrote acknowledging the receipt of the check and said:

"The Commission will consent to the transfer of the vessel to foreign ownership, registry, and flag as provided in Section 8 of the subject Invitation for Bids."

After the plaintiff had learned that his bid had been accepted, he asked Captain William C. Ash, who was a master mariner and a ship surveyor, to take charge of the delivery and commissioning of the ship. Captain Ash, upon examining the plans of the ship, thought well of it and thought that a profitable resale of the ship might be made, so he agreed to take charge of it. He had impressed upon the plaintiff the importance of the privilege of transferring the ship to foreign registry, because he knew that the strict standards of inspection of ships of American registry, and the high wages of seamen on ships so registered, would prevent profitable operation or sale under American registry. At his suggestion the plaintiff organized a Panamanian corporation, the Brownsam Company, wholly owned by the plaintiff, to take title to the ship and obtain a Panamanian flag for it.

On June 16, Captain Ash confirmed arrangements previously made by telephone with Captain Weiss, the District Manager of Alcoa Steamship Company at Norfolk, Virginia, where the ship was located, to take delivery of the ship and move it to a berth at Alcoa's yard. A

few days later he authorized Weiss to sell the ship "where is and as is" for $300,000. By the middle of July the plaintiff had received several promising tentative offers for the ship. He, however, decided to hold it for six months so that he could list his profit as a long-term capital gain for income tax purposes.

On June 24, the ship was placed in drydock and examined by the resident surveyor of the French classification society, Bureau Veritas. This society's approval was sufficient for Panamanian registry, but not for United States registry. The surveyor condemned one tail shaft and ordered that it be replaced.

On July 24, 1922, the Council of the League of Nations conferred upon Great Britain a mandate for Palestine, to be a homeland for the Jews. In a convention of December 3, 1924, between the United States and Great Britain, the United States consented to the administration of Palestine by Great Britain, "pursuant to the Mandate". After World War II there was an increasing movement of European Jews to Palestine. The British by decree imposed an immigration quota of 1,500 per month. Their decree was extensively evaded. Those who got in without quota clearance were designated by the British as "illegal" immigrants, and will be so referred to in this opinion.

Evidence gathered by the British Foreign Office in 1946 showed that support, in money and ships, for the illegal traffic was coming from sources within the United States. In December 1946, representations to that effect were made by that office to the United States. From that time our Department of State became concerned with Jewish migration to Palestine.

In October of 1946 the plaintiff had purchased a contract, made by another with the Maritime Commission, for the ship President Warfield. Within less than a month he sold his contract to the Weston Trading Company, a Panamanian corporation of which Captain Ash

was president. On April 21, 1947, the British Embassy in Washington advised the Secretary of State that it had been reliably informed that the President Warfield was destined for the illegal traffic in Jewish immigrants to Palestine, and that the Tradewinds and Northland, also owned by the Weston Trading Company, were being fitted out in Baltimore for the same purpose. Another of Weston's ships, the Ulua had cleared Baltimore in October 1946, and was reported at Havre on January 28, 1947, carrying 600 Jewish immigrants to Palestine. It was later intercepted by the British.

Sometime in April 1947 Captain Ash severed his connection with the Weston Trading Company in order to devote his full time to his labor union, the National Organization, Masters, Mates and Pilots, of which he was international vice president and local business manager.

On June 2, 1947, an Assistant to the Legal Adviser of the State Department conferred with the Assistant Attorney General in charge of the Criminal Division of the Department of Justice concerning "representations of the British Government regarding illegal acts in the United States which aid terroristic activities in Palestine." The State Department representative exhibited the FBI reports with respect to military training activities in New York and ships leaving the United States to carry immigrants to Palestine. There was discussion of the case of the Alabama during our Civil War, in which an arbitration tribunal awarded fifteen million dollars to the United States because Great Britain failed to prevent the departure from its ports of ships engaged in preying upon the commerce of the United States.

On June 5, 1947, President Truman issued a statement urging all United States citizens to refrain from engaging in or facilitating any activities which tended to further inflame the passions of the inhabitants of Palestine, to undermine law and order in Palestine, or to promote violence in that country. This statement was in accord with a resolu-

tion adopted on May 15, 1947, in the General Assembly of the United Nations.

When the Weston Trading Company purchased the President Warfield, having bought the plaintiff's contract for it, as recited above, it applied to the Maritime Commission for transfer to the Honduran flag, and the Commission consented. However, the Honduran Consul would not accept the vessel for Honduran registry until a sworn statement was given by Weston's President, Captain Ash, that the vessel would "not be used for running the British blockade into Palestine for the purpose of carrying refugees." On July 18, 1947, the President Warfield, renamed the Exodus 1947, was captured by the British off the port of Haifa carrying approximately 5,000 nonquota Jewish immigrants. In the boarding of the ship by the British there was a violent encounter in which an American citizen was killed. The British pointed out to our Government that their predictions as to the future conduct of the President Warfield had been fulfilled.

On August 7, 1947, the Secretary of State wrote the British Minister of Foreign Affairs to the effect that the United States would endeavor to see that no ships owned by the American Government were thereafter sold to persons whose activities gave reason for belief that the ships would be used for the purpose of transporting illegal immigrants to Palestine. Thereafter there were numerous representations made to State Department officials concerning the relation of Americans to illegal immigration to Palestine. The British Embassy in Washington pointed out the connection of Captain Ash with the President Warfield, and with the Colonel Johnson, the ship with which this litigation is concerned. On October 18, 1947, the British Ambassador wrote to the Secretary of State asking that all possible steps be taken to insure that the Colonel Johnson not be allowed to sail until her *bona fides* had been thoroughly established.

The plaintiff had been in South America from July or August 1947 until early October. Repairs to the ship had not been completed when he returned. He negotiated for a combination sale and charter of the ship to Dutch interests, and for a sale to an American corporation representing Syrian interests.

On October 22, 1947, the plaintiff's attorney applied to the Maritime Commission for the transfer of the ship to Panamanian registry and flag, and its sale to the Brownsam Company, which, as we have seen, was a Panamanian corporation wholly owned by the plaintiff. By this time the State Department had determined that the sailing of the Colonel Johnson had to be prevented, at least until an authoritative declaration of policy could be arrived at. The department had a statement from one of the seamen who had been on the President Warfield on its ill-fated voyage, saying that Captain Ash had signed him on the Ulua, the first ship sent out by the Weston Trading Company, telling him that the ship was going to engage in the illegal transportation of Jews to Palestine. Upon the request of the State Department the Maritime Commission withheld approval of the transfer of the plaintiff's ship until the State Department should withdraw its objection to the transfer. The Maritime Commission did not advise the plaintiff of its intentions, but he gathered from the fact that agents of the Internal Revenue Department and of the FBI questioned him, and from other events, that there was trouble in connection with his application for transfer.

On November 21 the plaintiff and his lawyer called at the Maritime Commission. They were referred to the State Department, where an Assistant Legal Adviser listened to their statements and then referred them to the First Secretary of the British Embassy, who did likewise. At both the State Department and the Embassy they were given assurances of sympathetic consideration. On this occasion the plaintiff told the State Department representative that a Dutch firm had agreed to accept an agency to operate the ship in the coastal trade in European Atlantic and Mediterranean waters, and that he was willing to give

all possible assurances that the ship would not be used in the illegal Palestinian traffic. He asked for an affidavit giving such assurance and he supplied such an affidavit on November 26.

On January 22, 1948, the Under Secretary of State "made a firm policy decision" the substance of which was:

"The State Department will not approve transfer * * * unless the owners * * * enter into a charter party with * * * [a] * * * firm of undoubted integrity, giving it full control over the operation of the ship, and providing against use of the ship in the Palestine immigration trade or sale to a 3rd party."

The State Department adhered to this policy until the British, after their mandate had ended and Israel had become an independent state, indicated in May 1948 that they had no further interest in the Colonel Johnson.

The plaintiff was advised of the State Department's decision of January 22, and began negotiations with Dutch companies looking toward the chartering of the vessel on a bareboat basis subject to the terms prescribed by the State Department. The plaintiff, not being able to negotiate a charter, sought to obtain the State Department's consent to an agency agreement with a Dutch company. The Department refused this consent, and insisted that a charter be arranged. The plaintiff continued during March, April and May, 1948, to arrange a charter to Dutch interests. On May 19 and 20, the State Department advised the plaintiff and the Maritime Commission, respectively, that it no longer objected to the transfer of the ship to the Panamanian flag provided that it was then chartered to the proposed Dutch interests, and that the charter provide that the ship should not call at Black Sea ports or transport illegal immigrants therefrom. The State Department's interest in the Black Sea ports was based upon its wish to keep down the number of communist immigrants to Israel, and its knowledge that many such immigrants were coming from Rumania.

On June 22, 1948 the Maritime Commission ordered that approval of the sale of the ship to an alien be granted subject to the condition that the transfer be effected within six months. On the next day the Maritime Commission's Chief, Bureau of Operations, notified the plaintiff by telegram of the approval and said that before the issuance of the formal transfer order the Commission should be furnished a certified copy of the charter party to the Dutch interests containing a provision that the ship would not call at Black Sea ports and transport immigrants therefrom. On June 28 the plaintiff furnished the requested document and on June 30 the Commission sent the plaintiff a certified copy of its order authorizing the transfer of the ship to Panamanian registry. On July 14 the plaintiff sent copies of the transfer order and other necessary documents, and a bill of sale to the Brownsam Company, the plaintiff's Panamanian corporation, to the plaintiff's agent at Norfolk where the ship was located. He also ordered that the ship be renamed Derecktor.

In August 1948 the ship was moved to New York. In the same month, the charter to the Dutch company was abandoned because of that company's inability to obtain necessary dollars. Within two or three weeks thereafter the plaintiff sold all the stock of the Brownsam Company to the American-Israeli Company, thereby making that company the owner of the corporation and the ship. Captain Ash assisted the plaintiff in negotiating the sale. In November 1948 the ship was sold to an agency of the State of Israel, and was renamed the Galilah. In January 1949 it went to Constanza, Rumania, on the Black Sea, and picked up 1326 passengers bound for Haifa, Israel.

The Maritime Commission's refusal to approve of the transfer of the ship to Panamanian ownership and registry damaged the plaintiff financially, in the maintenance costs to which he was sub-

jected during the period of the delay, and in the fall of the market price of ships during that period. Our problem is to determine whether the Maritime Commission's refusal was justified. The refusal was at the behest of the State Department. The State Department was moved, in the beginning at least, by representations made to it by the British Government.

The British Government had undertaken the mandate for Palestine for the League of Nations in 1922. We had formally recognized the mandate in 1924. It was a burdensome and thankless task for the British. We are in no position to judge whether they performed it wisely or unwisely. After World War II the British task became almost impossibly difficult. The natural urge of Jews to leave Europe, the site of their incredible persecution by the Nazis, and the sympathetic support of their more fortunate brethren in America and elsewhere, combined to set in motion an immigration into Palestine which, if left unrestricted could only have resulted in hardship and disorder. Britain set a quota of the number of immigrants that she thought could be assimilated. The evasion of that quota became a great industry, financed by many rich Americans.

Britain complained to the United States, through proper channels, that our citizens were fitting out ships in our shipyards and recruiting crews in our ports, to evade and nullify Britain's policy with regard to her Palestine mandate. The law, as is not unusual in international affairs, was not clear, but the moral obligation not to permit our resources to be used as a nuisance to a friendly power was clear.

In the case of the Alabama, we had complained bitterly of Britain's conduct in allowing her facilities to be used to fit out ships to prey upon our commerce. The arbitrators concluded that our complaint was justified and awarded us damages of more than $15,000,000. That there was a real danger that the Colonel Johnson would, if it got outside the control of the United States, be used to run the British blockade, was a natural deduction from the evidence at hand. Captain Ash's past conduct and the history of the ships of his Weston Trading Company, pointed strongly in that direction.

If it had been possible for the plaintiff to operate his ship under American registry and flag, our Government could have controlled its voyages, and the bottling up of the ship at Norfolk would not have been necessary. But the plaintiff, quite naturally, was not willing to spend on the ship what it would have cost to put it in class as an American ship, nor to pay the costs of operating it as an American ship. When once it has passed to Panamanian ownership and registry it would have been beyond the control of our Government, no matter what it did. That it ultimately did engage in frustrating our own policy against transporting immigrants from Communist Rumania to Israel shows how helpless our Government was once the transfer had been accomplished.

The plaintiff points to the language of the contract of sale. It said that the Maritime Commission would consent to the transfer of the ship to foreign ownership, registry and flag. The Commission did not so consent, except after a long delay, and the plaintiff was damaged by its failure to do so. The Government defends its apparent breach of contract on the ground that the State Department, responsible for the conduct of our foreign relations, had probable cause to believe that if transfer was permitted, our foreign relations might be seriously prejudiced. As we have indicated above, we think the State Department did have probable cause to believe as it did. And, so believing, we think it had the duty to object to the transfer and that the Maritime Commission had the duty to withhold its consent.

The State Department's action was a sovereign act. It was, in effect, an embargo. It seems to have applied to only one ship. But we have no doubt that the same policy would have been applied to any other ship or owner if there had been probable cause to believe that it present-

.ed the same problem. There is no suggestion in the record that the Government's representatives bore any malice or prejudice toward the plaintiff. If there is any field in which the hands of the Government should not be tied, in which it should feel free to meet and solve problems without fear of being charged with breach of contract, that field must be peculiarly the field of international relations.

With the wisdom of hindsight, we think that the plaintiff's principal, perhaps only, motive in acquiring the ship in question was to sell it at a profit. As to the motives of Captain Ash, we are in doubt. But we think that the State Department kept well within the boundaries of its responsibilities in refusing to let the ship get beyond the control of the Government.

The plaintiff's petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and LITTLETON, Judge, concur.

WHITAKER, Judge (dissenting).

·I must express the reasons for my dissent from the opinion and decision of the majority, because I think there has been a flagrant violation of a right of one of our citizens by his Government, which seeks to escape liability under the cloak of the immunity of a sovereign. This is a case in which this court gives sanction to bureaucratic action in violation of a right, this time a right acquired in consideration of the payment of a large sum of money to the defendant itself, who asserts the power to keep the money and to deny the right for which the money was paid. I cannot allow such a decision to go unchallenged.

One of the rights inherent in the ownership of property is the right to sell it to anyone who wishes to buy it. This right is, however, frequently restricted by statute or by contract; but, unless so restricted, it is absolute.

In 1916 Congress passed and the President approved the Shipping Act of 1916, Act of September 7, 1916, c. 451, 39 Stat. 728. Its caption says it is:

"An Act To establish a United States Shipping Board for the purpose of encouraging, developing, and creating a naval auxiliary and naval reserve and a merchant marine to meet the requirements of the commerce of the United States with its Territories and possessions and with foreign countries; to regulate carriers by water engaged in the foreign and interstate commerce of the United States; and for other purposes."

By sections 7 and 8 the Shipping Board, created by the Act, was authorized to sell or lease any vessel acquired by it. By section 9 it was required that any vessel purchased, chartered, or leased from the Board should be eligible for American registry, and should be operated only under such registry, "unless otherwise authorized by the board". It was also provided. at p. 731:

"* * * No such vessel, without the approval of the board, shall be transferred to a foreign registry or flag, or sold; nor, except under regulations prescribed by the board, be chartered or leased."

This section was amended several times before the transaction in question. As last amended, by the Act of June 23, 1938, 52 Stat. 953, 964, section 9 was made to read in part as follows:

"* * * it shall be unlawful, without the approval of the United States Maritime Commission, to sell, mortgage, lease, charter, deliver, or in any manner transfer, or agree to sell, mortgage, lease, charter, deliver, or in any manner transfer, to any person not a citizen of the United States, or transfer or place under foreign registry or flag, any vessel or any interest therein owned in whole or in part by a citizen of the United States and documented under

the laws of the United States, or the last documentation of which was under the laws of the United States."

So that, at the time plaintiff acquired the vessel, Colonel Frederick C. Johnson, his right to sell it to anyone who wished to buy it, or to transfer it to foreign registry, was restricted by the necessity to secure the approval of the Maritime Commission, which had succeeded to the powers of the Shipping Board.

But this was the only restriction which the law placed on his right to sell it or to transfer it to foreign registry. Only the approval of the Maritime Commission had to be obtained. No other approval was required.

This being the law, the Maritime Commission advertised for bids on the Colonel Frederick C. Johnson. One of the inducements to secure bids, as set out in the invitation for them read:

"* * * The Commission will consent to the transfer of the vessel to foreign ownership, registry, and flag pursuant to the applicable provisions of the Shipping Act, 1916, as amended, provided the transfer is made effective within (6) months from the date of award and provided, further, the transferee, in the determination of the Commission, is not an alien country, or a national or nationals thereof prohibited by the Government of the United States from engaging in commercial transactions with the United States and its citizens or anyone acting on behalf or in the interest thereof. The applicant shall submit such evidence as the Commission shall deem necessary in connection with such application for transfer.

Thus the Commission, as an inducement to secure plaintiff's bid, said it would consent to the transfer of the vessel to foreign registry, provided only the request for the transfer be made in 6 months and the transferee was not an enemy country or an enemy alien.

With this inducement in mind, plaintiff offered $48,120 for the vessel. His offer was accepted, and he paid the amount on June 12, 1947. In his letter transmitting the payment he said:

"Kindly let me have a Bill of Sale and Certificate of Registry, and a written acknowledgment of my full right to transfer this vessel to foreign registry if I should so desire."

In reply the Maritime Commission wrote plaintiff acknowledging the check and saying:

"The Commission will consent to the transfer of the vessel to foreign ownership, registry, and flag as provided in Section 8 of the subject Invitation for Bids."

Section 8 of the Invitation for Bids is set out above.

We have, then, an unequivocal commitment to consent to the transfer, provided only that the request for the consent be made in 6 months, and that the transferee be not an enemy country or an enemy alien. It is agreed that the request for consent was made in 6 months and that the transferee was not an enemy country or an enemy alien. The Shipping Act plainly gave the Commission the power to make such an agreement.

This agreement was made as part consideration for the payment of $48,120. There is no question that this money would not have been offered or paid except for this agreement.

The consent was not given when it was requested. It was not given until June 30, 1948, and then only after plaintiff had satisfied additional requirements imposed by the Maritime Commission.

There can be no doubt that defendant violated its agreement, an agreement made to secure from plaintiff $48,120. As a result plaintiff has suffered considerable damage.

The only excuse offered for this breach of faith is that the State Department feared that the vessel would be used to carry Jews to Palestine in violation of the policy adopted by the British Government regulating the admission of immigrants to that country.

For the purposes of this case I am not at all concerned with the propriety of

the efforts of the State Department to prevent the use of an American vessel in this traffic. This is beside the issue. The issue is the sanctity of contracts, the dishonesty of the Government's inducing payment of money to it on the faith of its agreement to do a thing it later refuses to do, and this without any offer to return the money paid, but, instead, a refusal to reimburse the payor for the damages he suffered thereby.

I cannot give my approval to such conduct.

If international politics demanded that the Maritime Commission repudiate its agreement, then justice demands that the defendant respond in damages therefor.

The majority opinion says the Maritime Commission and the State Department were exercising sovereign powers in refusing the consent. No sovereign has the power to induce the payment of money to it in consideration of a promise and then not keep the promise, or pay for the damages suffered for its failure to do so.

I respectfully dissent.

LARAMORE, Judge, concurs in the above dissent.